# United States Court of Appeals
## For the First Circuit

No. 04-2548

JULIETTE KAWEESA,
Petitioner,

v.

ALBERTO R. GONZÁLES,[*] ET AL.,
UNITED STATES ATTORNEY GENERAL,
Respondents.

ON PETITION FOR REVIEW OF AN ORDER OF
THE BOARD OF IMMIGRATION APPEALS

Before

Torruella, Circuit Judge,
Hill,[**] Senior Circuit Judge,
and Howard, Circuit Judge.

Ara H. Margosian, II, with whom Law Office of Ara H. Margosian, P.C. was on brief, for petitioner.
Francis W. Fraser, Senior Litigation Counsel, Office of Immigration Litigation, Civil Division, with whom Peter D. Keisler, Assistant Attorney General, and Donald E. Keener, Deputy Director, were on brief, for respondents.

June 9, 2006

---

[*] Alberto R. Gonzáles was sworn in as United States Attorney General on February 3, 2005. We have therefore substituted Attorney General Gonzáles for John Ashcroft as the respondent. See Fed. R. Civ. P. 25(d)(1); Fed. R. App. P. 43(c)(2).

[**] Of the Eleventh Circuit, sitting by designation.

**TORRUELLA**, **Circuit Judge**.   This case was originally transferred here by the district court for review of a decision by the Board of Immigration Appeals ("BIA") denying Petitioner Juliette N. Kaweesa's Third Motion to Reopen proceedings following an in absentia removal order.   The passage of the REAL ID Act of 2005, Pub. L. 109-13, 119 Stat. 231, changed the scope of our review and put before us Kaweesa's claims regarding her First Motion to Reopen.   After careful consideration we reverse and remand.

## I.   Factual Background and Proceedings Below[1]

Kaweesa served as a Christian minister in a well-known preaching and music ministry in Kampala, Uganda, working primarily with women and children.   She was active with Human Rights Africa and shared that group's message of respect for women with other women in her ministry.   Kaweesa's husband, Stephen, was the pastor of the Heritage Revived Church in Uganda until he was taken from their home by government security officers in 1994.   He was never heard from again and is presumed dead.   Kaweesa believes that her husband and brother were involved in a rebel freedom movement.   She also has information that both her parents and her brother have been killed.   Soon after her husband disappeared, Kaweesa was taken by government security officers to military barracks outside of

---

[1]  We take the facts regarding Kaweesa's experiences in Uganda from her asylum application.

Kampala, where she was interrogated, beaten, and raped by several different men over the course of three weeks.

Kaweesa entered the United States on August 2, 1994, on a B-2 visa obtained to attend a religious conference. She overstayed her visa and filed for asylum, withholding of removal, and relief under the Convention Against Torture ("CAT") in October 1997. At her February 22, 1999 interview with the Immigration and Naturalization Services ("INS"),[2] Kaweesa conceded that she was removable. She explained that she waited longer than one year to apply for asylum because during that time she held out hope that she could safely return to her country. On February 23, 1999, the INS issued Kaweesa a Notice to Appear before an Immigration Judge ("IJ") on May 13, 1999, noting that she could request asylum again at that hearing. Kaweesa did not appear at the scheduled hearing, and the IJ entered an in absentia removal order. On May 19, 1999, Kaweesa filed a pro se letter seeking to reopen her proceedings ("First Motion to Reopen"). According to an affidavit filed by Kaweesa, she got the dates of her hearing mixed up and thought that the hearing was on May 17.[3] After she returned home from work on

---

[2] In March 2003, the relevant functions of the INS were transferred into the new Department of Homeland Security and reorganized into the Bureau of Immigration and Customs Enforcement. For simplicity, we refer to the agency throughout this opinion as the INS.

[3] In the affidavit, Kaweesa stated that she had even asked her employer for a day off on May 17 so that she could attend the hearing.

-3-

May 15, she found a letter in her mailbox informing her that she had missed her hearing and that an in absentia removal order had been entered. She went down to the immigration court on May 17 and asked to speak with the IJ. She was told by a clerk that her only remedy was to file a motion to reopen, which she did on May 19.

The INS did not file a response and the motion was therefore deemed unopposed. However, the IJ denied the motion based on a finding that Kaweesa had not demonstrated the requisite "exceptional circumstances" warranting reopening under § 240(e)(1) of the Immigration and Nationality Act ("INA"), 8 U.S.C. § 1229a (e)(1).[4] Kaweesa timely appealed to the BIA, which affirmed the IJ's decision without opinion on May 6, 2002. Kaweesa did not appeal the BIA's decision to this Court, apparently due to the fault of her counsel.[5]

---

[4] We explain below the procedure for moving to reopen following an in absentia removal order, as well as what constitutes "exceptional circumstances."

[5] Kaweesa was represented by attorney Daniel F. Cashman before the BIA. In May 2002, Cashman informed Kaweesa of the BIA's decision by letter but never informed her that he no longer wished to represent her or of her right to appeal the decision to this Court. He also stopped returning her calls. In June 2002, Kaweesa consulted with Alex Almondel, who held himself out to be an immigration attorney and told her that he filed an appeal with the BIA (not the First Circuit). In April 2003, Kaweesa learned from a Boston Globe article that Almondel was not a licensed attorney in Massachusetts and had been misrepresenting himself as an immigration attorney. She retained attorney Elizabeth Broderick, who discovered that Almondel never filed anything. Broderick filed the Second Motion to Reopen on July 29, 2003.

-4-

On June 17, 2003, Kaweesa was taken into custody by the INS. On July 29, 2003, Kaweesa filed another motion to reopen with the BIA ("Second Motion to Reopen"). This motion did not address her failure to attend her removal hearing, but rather alleged that changed circumstances in Uganda and newly acquired evidence made her eligible for asylum and for relief under the CAT. The evidence included: (1) a report from Kaweesa's counsel, based on a telephone conversation, that in August 2001 Kaweesa's son Fred Sempijja was beaten by government soldiers who wished to learn of his mother's whereabouts, along with a photograph of her son showing a head wound; (2) a letter to Kaweesa dated February 12, 2003, from Father John Musisi of the Christ Church Parish in Gulu, Uganda, warning that security in Uganda "is still growing worse" and advising Kaweesa not to return "for some time"; (3) two letters from reverends of Massachusetts churches stating that before Kaweesa came to the United States, they knew of her ministry and evangelical activities in Uganda; (4) a news article dated April 11, 2003, on the Uganda Human Rights Commission, which had reported numerous incidents of government torture in 1999-2001; and (5) a 2002 U.S. State Department Report on Human Rights Practices in Uganda, which found that government forces arbitrarily arrested and detained citizens.

On November 12, 2003, the BIA denied the Second Motion to Reopen as numerically and time-barred under 8 C.F.R. § 1003.2

(c)(2), and as not falling within the regulatory exception to the time and numerical limitations in cases of motions to reopen to apply for asylum based on changed country circumstances under 8 C.F.R. § 1003.2(c)(3)(ii).[6] The BIA ruled that in order to come within the regulatory exception, Kaweesa had to establish prima facie eligibility for asylum or withholding of removal. The BIA found that the evidence was insufficient to establish eligibility for asylum, because reports of the son's beating were uncorroborated by medical records or "even an affidavit from him" and because it could have been presented to the BIA earlier. Based on counsel's advice, Kaweesa did not appeal the BIA's decision to this Court.

On April 15, 2004, still in custody, Kaweesa filed another motion to reopen with the BIA ("Third Motion to Reopen"), once again based upon "newly discovered evidence and changed country conditions in her native Uganda." The motion argued that the "unavailable and undiscoverable material evidence -- taken in conjunction with the evidence already in the record -- demonstrates Kaweesa's prima facie eligibility for relief under asylum law,

---

[6] Under the regulations, a party may in general file only one motion to reopen, and that motion must be filed within 90 days after the final administrative decision is entered. See 8 C.F.R. § 1003.2(c)(2). There is an exception to this general rule if the motion is filed to apply for asylum or withholding of removal due to changed country conditions, and if the evidence provided is material and could not have been discovered at the time of the prior hearing. See id. § 1003.2(c)(3)(ii).

-6-

withholding of removal, and [CAT]." She further argued that the new evidence explained why she missed her May 13, 1999 hearing and why she did not bring her claims more promptly. The evidence submitted with this motion consisted of the following: (1) the affidavit of Dr. Michael Grodin, psychiatrist, dated April 12, 2004, concluding based upon an interview with Kaweesa that she "displays moderate symptoms of [Major Depressive Disorder] and [Post-Traumatic Stress Disorder]," which frequently interfere with memory and could have contributed to her failing to appear at her May 13, 1999 hearing; (2) the Human Rights Watch Report, dated March 2004, based in part on interviews with prisoners during visits to Uganda in 2002 and 2003, reporting that "[t]he use of torture as a tool of interrogation is foremost among an escalation in human rights violations by Ugandan security and military forces since 2001"; (3) the 2003 U.S. State Department Country Conditions Report on Uganda, released on February 25, 2004, reporting that "[t]orture by security forces and beating of suspects to force confessions were serious problems"; (4) the affidavit of Douglas A. Feldman, Ph.D. in Anthropology, dated April 12, 2004, discussing the sociopolitical situation in Uganda, analyzing the above-mentioned Human Rights Watch Report, and opining that "it is far more likely than not that [Kaweesa] would be tortured, raped and beaten again if she returns to Uganda"; (5) a letter from Kaweesa's son Fred Sempijja, dated December 17, 2003, stating that his mother

had been beaten prior to her departure to the United States, and reporting that on August 26, 2001, "men broke into [his] home and tried to kill [him] after [he] failed to give them the whereabouts of [his] mother"; and (6) the affidavit of Rev. Baker Katende, Pastor of Global Evangelical Church of Waltham, Massachusetts, dated April 9, 2004, stating that he knew Kaweesa and her husband in the late 1980s because of their church activities in Uganda. Kaweesa argued before the BIA that this evidence was previously unavailable and that it established her prima facie eligibility for asylum.

On April 16, 2004, Kaweesa also filed a habeas petition in the district court. She argued that the IJ committed clear legal error by failing to examine the totality of circumstances surrounding her First Motion to Reopen. Kaweesa also argued that the BIA's denial of her First and Second Motions to Reopen violated her due process rights. Specifically, Kaweesa claimed that the BIA failed to consider her claim that she was prima facie eligible for withholding of removal and relief under the CAT. The habeas petition did not challenge the BIA's denial of her Third Motion to Reopen, because the BIA had not made its decision regarding the Third Motion to Reopen when Kaweesa filed her habeas petition.

On May 3, 2004, the BIA denied Kaweesa's Third Motion to Reopen, noting that it was numerically and time-barred under 8 C.F.R. § 1003.2(c)(2), and finding again that Kaweesa failed to

satisfy the exception to the time and numerical limitations under 8 C.F.R. § 1003.2(c)(3)(ii), because she offered "no reasonable explanation . . . as to why relevant documentary evidence and the attached affidavits could not have been previously discovered and presented in a timely manner pursuant to the regulations" set forth in 8 C.F.R. § 1003.2(c)(1). The BIA separately denied the motion in the exercise of its "broad discretion," stating that the motion appeared dilatory in nature, and hence fell within the Supreme Court's admonition disfavoring legal maneuvers designed to delay deportation. At the time of the BIA's decision, Kaweesa's habeas case was still pending in district court.

At a May 11, 2004 hearing before the district court, Kaweesa's counsel informed the court of the BIA's decision and of Kaweesa's intent to pursue every avenue of relief possible, which the court interpreted as including a direct appeal of the BIA's denial of her Third Motion to Reopen. Although Kaweesa never actually filed that appeal,[7] the district court treated the denial of the Third Motion to Reopen as part of the habeas case. On November 18, 2004, the district court determined that it had habeas jurisdiction to review Kaweesa's First Motion to Reopen.[8] However, the district court found that it had no jurisdiction to review the

---

[7]  Her counsel withdrew once again.

[8]  The district court determined that it did not have habeas jurisdiction over the Second Motion to Reopen.

denial of the Third Motion because, as of the date when it incorporated that denial into the habeas case, Kaweesa still had the right to file a petition for direct review with this Court. Hence, the district court transferred the entire case to this Court under 28 U.S.C. § 1631 following a procedure we approved in Arevola v. Ashcroft, 344 F.3d 1, 16 (1st Cir. 2003), so that we could effect direct review of the BIA's May 3, 2004, decision.

On June 8, 2005, we heard oral arguments on the issue of whether the BIA abused its discretion in denying Kaweesa's Third Motion to Reopen. Upon our decision, the district court intended to rule upon Kaweesa's habeas claims arising out of the IJ's and BIA's denial of her First Motion. However, effective May 11, 2005, the REAL ID Act of 2005, Pub. L. 109-13, 119 Stat. 231, stripped the district court of jurisdiction over Kaweesa's remaining habeas claims, meaning that we could not transfer the case back to the district court upon our review of the BIA's decision regarding the Third Motion to Reopen.

Given these events, we requested supplemental briefing from the parties in December 2005, and now review Kaweesa's "habeas" challenges of the denial of her First Motion to Reopen as a petition for direct review, along with her challenge of the denial of her Third Motion to Reopen.[9] We find that the denial of

---

[9] We do not address the denial of the Second Motion to Reopen because the district court found that it lacked jurisdiction over that issue.

the First Motion to Reopen was based on an error of law.  We therefore reverse the IJ's denial of the First Motion to Reopen and do not address the denial of the Third Motion to Reopen.

**II.**

### A.  Jurisdiction

Under the REAL ID Act's transfer provision, Pub. L. 109-13, § 106(c), 119 Stat. at 311, all cases challenging final administrative orders of removal pending in the district courts as of May 11, 2005, were transferred to the courts of appeals for review.  We are to treat these cases as if they had been filed pursuant to a petition for review under INA § 242, 8 U.S.C. § 1252, except that subsection b(1), which contains time limitations on petitions for direct review in the courts of appeals, does not apply.  See Ishak v. Gonzáles, 422 F.3d 22, 25 (1st Cir. 2005); REAL ID Act of 2005, Pub. L. 109-13, Div. B, § 106(c), 119 Stat. at 311.  We have held that this provision also applies to habeas appeals pending in this Court.  See Ishak, 422 F.3d at 30.  We therefore treat Kaweesa's habeas claim regarding the First Motion to Reopen as a petition for direct review.  Since the time limitations on petitions for direct review do not apply to a claim such as this, the fact that the usual time limit for a direct appeal on this claim has long passed does not deprive us of jurisdiction.

This does not end our jurisdictional inquiry. Under the INA, as amended by the REAL ID Act, we do not have jurisdiction to review discretionary or factual determinations. See Mehilli v. Gonzáles, 433 F.3d 86, 93 (1st Cir. 2005). Generally, we review an IJ's decision to deny a motion to reopen for abuse of discretion. See Herbert v. Ashcroft, 325 F.3d 68, 70 (1st Cir. 2003). Therefore, it might appear at first that we do not have jurisdiction over the denial of the First Motion to Reopen.[10]

---

[10] Kaweesa argues that an IJ's decision on whether to grant a motion to reopen an in absentia removal order is not discretionary and that we therefore have jurisdiction over the denial of the motion to reopen. Under the relevant statute, 8 U.S.C. § 1229a (b)(5)(C):

Such an [in absentia removal] order may be rescinded only --

(i) upon a motion to reopen filed within 180 days after the date of the order of removal if the alien demonstrates that the failure to appear was because of exceptional circumstances (as defined in subsection (e)(1) of this section), or

(ii) upon a motion to reopen filed at any time if the alien demonstrates that the alien did not receive notice in accordance with paragraph (1) or (2) of section 1229(a) of this title or the alien demonstrates that the alien was in Federal or State custody and the failure to appear was through no fault of the alien.

(emphasis added). Kaweesa argues that, although the statute says "may," if an alien proves that she did not receive notice or was prevented from attending by the government, the IJ would have to grant the motion to reopen because the failure to do so would violate the alien's due process rights. Therefore, Kaweesa argues, the word "may" does not indicate the existence of discretion, at least as to motions to reopen under § 1229a(b)(5)(C)(ii). Since "may" is also used in reference to § 1229a(b)(5)(C)(i), Kaweesa argues that it must also apply in the same way; that is, an IJ must

-12-

However, under the REAL ID Act we retain jurisdiction over constitutional questions or questions of law. 8 U.S.C. § 1252(a)(2)(D). Therefore, if an IJ's denial of a motion to reopen constitutes an error of law or a violation of constitutional rights, we may review those issues. Of course, such a decision would also constitute an abuse of discretion. See, e.g., Wang v. Ashcroft, 367 F.3d 25, 27 (1st Cir. 2004) (stating that we will find an abuse of discretion if the BIA misinterprets the law). However, the fact that we review denials of a motion to reopen for abuse of discretion does not, in and of itself, preclude us from reviewing at least certain aspects of that decision, since we still retain the power to review constitutional questions and questions of law. Thus, to the extent the IJ's decision constituted an error of law or violation of constitutional rights, we retain jurisdiction to review it.

## B. First Motion to Reopen

Under 8 U.S.C. § 1229a(b)(5)(A), an alien who fails to attend her hearing "shall be ordered removed in absentia if the [INS] establishes by clear, unequivocal, and convincing evidence that the [required] written notice was so provided and that the alien is removable." An in absentia order of removal may be

---

grant an alien's motion to reopen if that alien demonstrates "exceptional circumstances." While Kaweesa's argument is certainly interesting, we need not reach it because our decision is based on a question of law, over which we clearly have jurisdiction.

-13-

rescinded upon a motion to reopen filed within 180 days after the date of the order of removal if the alien demonstrates that the failure to appear was because of exceptional circumstances, or upon a motion filed at any time if the alien demonstrates that he or she did not receive notice or was in state or federal custody. Id. § 1229a(b)(5)(C). These restrictions were adopted in response to a serious problem of aliens deliberately failing to appear for hearings and thus effectively extending their stay in this country. See Herbert, 325 F.3d at 71. The exceptional circumstances standard is a "fairly tough one," Georcely v. Ashcroft, 375 F.3d 45, 50 (1st Cir. 2004), and will be met in only "rare cases." Herbert, 325 F.3d at 72.

In deciding the validity of a claim of exceptional circumstances, the "totality of the circumstances must be considered." Id. (emphasis added). We have never explained what "totality of the circumstances" means in this context. However, the BIA has stated that, among the factors that may be considered are supporting documentary evidence, the alien's efforts in contacting the immigration court, and the alien's promptness in filing the motion to reopen. In re B-A-S, 22 I. & N. Dec. 57, 58-59 (BIA 1998). Other possible factors may include the strength of the alien's underlying claim, the harm the alien would suffer if the motion to reopen is denied, and the inconvenience the government would suffer if the motion is granted. See, e.g., Singh

-14-

v. INS, 295 F.3d 1037, 1039-40 (9th Cir. 2002); Barseghian v. INS, 14 Fed. Appx. 806, 807-08 (9th Cir. 2001); Thomas v. INS, 976 F.2d 786, 791 (1st Cir. 1992) (Breyer, C.J., dissenting).  However, we need not catalogue every possible factor that might go into a totality of the circumstances analysis, because, as we discuss below, the IJ in this case did not consider any of the above possible factors, or any other factors.

We also wish to point out that the statutory concern with notice and exceptional circumstances is grounded in due process considerations.  See, e.g., Nazarova v. INS, 171 F.3d 478, 482 (7th Cir. 1999).  We have stated repeatedly that "'the Fifth Amendment entitles aliens to due process of law in deportation proceedings.'" Choeum v. INS, 129 F.3d 29, 38 (1st Cir. 1997) (quoting Reno v. Flores, 507 U.S. 292, 306 (1993)).  As the Ninth Circuit has stated, "[t]he liberty interests involved in removal proceedings are of the highest order.  Removal visits a great hardship on the individual and deprives him [or her] of the right to stay and live and work in this land of freedom." Lanza v. Ashcroft, 389 F.3d 917, 927 (9th Cir. 2004) (citation and internal quotation marks omitted).  These concerns are amplified in a case such as Kaweesa's, where an alien is seeking asylum or protection under the Convention Against Torture.  Kaweesa has alleged that in her home country she was raped; her husband, parents, and brother were

-15-

killed; and her son was beaten.  She clearly has a weighty interest in avoiding deportation.[11]

"At the core of these due process rights is the right to notice of the nature of the charges and a meaningful opportunity to be heard."  Choeum, 129 F.3d at 38.  These core concerns animate the provisions in 8 U.S.C. § 1229a that govern motions to reopen in absentia removal orders.[12]  Where an alien misses a hearing due to lack of notice or exceptional circumstances, due process concerns, i.e., the right to notice and a meaningful opportunity to be heard, are implicated.[13]  In our view, one reason the Immigration Judge

---

[11]  Of course, on the other side of the scale is the countervailing government interest in the efficient processing of deportation proceedings, which, as we noted above, was a motivating concern in allowing in absentia deportations in the first place.  However, as we discuss below, that concern is low in the instant case since there is no indication that Kaweesa missed her hearing in order to delay proceedings.

[12]  These concerns have led to decisions requiring the BIA to reopen proceedings in a number of different factual scenarios.  See, e.g., Lo v. Ashcroft, 341 F.3d 934, 939 (9th Cir. 2003) (requiring the BIA to open proceedings because of counsel's ineffective assistance); Barseghian, 14 Fed. Appx. at 807-08 (9th Cir. 2001) (requiring the BIA to reopen proceedings where the petitioner innocently mistook the date of his hearing); Nazarova v. INS, 171 F.3d 478, 485 (7th Cir. 1999) (requiring the BIA to reopen proceedings where the petitioner's late arrival was caused by her translator); Romero-Morales v. INS, 25 F.3d at 131 (vacating the denial of the motion to reopen because of the IJ's failure to examine the particulars of the case).

[13]  We wish to be clear that we are not saying that due process concerns dictate than an alien who demonstrates exceptional circumstances must have his or her motion to reopen granted.  This is essentially the argument we discussed above and declined to reach, see supra note 11.  All we are saying is that due process considerations are at work in the background of the provisions in

-16-

must consider the totality of the circumstances in deciding the validity of a claim of exceptional circumstances is to ensure that an alien is not deprived of a meaningful opportunity to be heard.

With these background principles in mind, we turn to Kaweesa's case. Kaweesa has conceded throughout the proceedings that she is removable and that she failed to attend her initial hearing on May 13, 1999. Her multiple affidavits -- but more importantly, her actions -- demonstrate that she inadvertently mistook the May 13 hearing date for May 17. The IJ concluded that this "not incomprehensible" error did not amount to exceptional circumstances as defined in 8 U.S.C. § 1229a(e)(1) because Kaweesa "could have easily contacted the Court to verify her hearing date to avoid her dilemma." However, Kaweesa had no reason to verify her hearing date since she thought it was May 17.[14]

In short, it does not appear as if the IJ considered any of the factors we mentioned above,[15] nor does it appear that Kaweesa's failure to appear was deliberate or due to a desire to

8 U.S.C. § 1229a.

[14] This is not to say that whether an alien has attempted to confirm the hearing date is immaterial, even in this case, but, standing alone the failure to undertake such an effort cannot be sufficient to deny relief, else there would be no need to consider other factors identified by the courts and the BIA.

[15] Where the BIA summarily affirms the IJ's determination under its streamlined procedures, we treat the findings and conclusion of the IJ as the BIA's own opinion. Albathani v. INS, 318 F.3d 365, 373 (1st Cir. 2003).

delay proceedings.  For example, Kaweesa's promptness in personally going to the court after receiving her in absentia removal notice, her diligence in filing a pro se letter on May 19, and evidence that she had asked her employer for a day off on May 17 all show that her error was not due to a desire to avoid her hearing or delay the proceedings.  See Herbert, 325 F.3d at 71.  The IJ did not consider any of these factors.  Further, Kaweesa's claims of rape and the fate of her husband, parents, and brother, if true, could very well have been sufficient for a grant of asylum.  Consequently, the harm of returning Kaweesa to Uganda without a hearing could have potentially been great.  On the other hand, since the hearing was only Kaweesa's first scheduled appearance before the IJ, it does not appear as if there would have been great prejudice or inconvenience to the government or the immigration court in granting the motion to reopen.

We have considered similar issues in two prior cases.  In Thomas, over the dissent of then-Judge Breyer, we upheld the BIA's affirmance of an in absentia removal order entered when the petitioner showed up late to a hearing due to an alleged miscommunication with counsel.  976 F.2d at 788.  In that case, the petitioner entered removal proceedings following a conviction for assault and battery.  Id. at 787.  A total of five hearings were held between April and December 1987.  Id.  The petitioner had been granted continuances on three occasions due to the absence of

-18-

counsel, including one where counsel failed to provide any explanation for the absence. Id. After granting the third continuance, the IJ told the petitioner that he had "one more chance." Id. at 787-88. After a fourth hearing attended by both the petitioner and counsel, a fifth hearing was scheduled, and both petitioner and counsel were late due to the alleged miscommunication. The IJ entered an in absentia removal order. On appeal, we upheld the BIA's affirmance. In a dissent, then-Judge Breyer stated that he would remand the case "[g]iven the consequence [to the alien], the minimal procedural interference, and the serious claim for relief from deportation . . . ." Id. at 791 (Breyer, C.J., dissenting).

In Herbert, we found that the IJ abused his discretion in denying a motion to reopen based on exceptional circumstances where petitioner's counsel notified the court two hours in advance that he had a scheduling conflict and petitioner showed up 30 minutes late due to traffic. 325 F.3d at 70. We relied on counsel's excusable absence as the most important factor, reasoning that the IJ should have granted a continuance to protect the petitioner's right to be represented by his counsel and that failure to do so simply because the petitioner was held up in traffic was an abuse of discretion, even if being held up in traffic alone did not qualify as exceptional circumstances. Id. at 72.

However, what truly distinguished Herbert's case from Thomas's is that there was "nothing in the record to suggest" that Herbert's own tardiness and his counsel's failure to appear were "a ploy to avoid the deportation hearing." Id. at 72 n.1. We believe the same can be said for Kaweesa, especially considering her conduct following her receipt of the removal order. We also note that the hearing was Kaweesa's first scheduled appearance before the IJ, and she was appearing without counsel. She likely would have been entitled to a continuance often granted to petitioners who come to their first hearing unrepresented by counsel, and there is no reason to think that she skipped her hearing simply to cause delay. See Thomas, 976 F.2d at 787 (the IJ first continued petitioner's case to give him time to secure counsel). Moreover, in both Thomas and Herbert, the petitioners were not seeking asylum or relief under the Convention Against Torture. The potential consequences to Kaweesa, rape and torture, are much greater than mere deportation. In sum, because the IJ must consider the totality of the circumstances, and because it is plain that the IJ looked no further than the fact that Kaweesa mixed up the dates, the IJ committed an error of law. Given our review of the record, we believe that Kaweesa has demonstrated exceptional circumstances and that her motion to reopen should have been granted.

**III.**

For the foregoing reasons, we reverse the BIA's denial of Kaweesa's First Motion to Reopen and remand this case with instructions to order a new hearing before the IJ to determine the merits of her requests for relief from deportation.

**<u>Reversed and Remanded</u>**.